[Cite as *In re J.R.*, 2020-Ohio-1347.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| J.R. | : | No. 19AP-228 |
| | | (C.P.C. No. 17JU-12152) |
| (R.N.A., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant). | : | |
| In the Matter of: | : | |
| M.A. | : | No. 19AP-229 |
| | | (C.P.C. No. 17JU-12163) |
| (R.N.A., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant). | : | |
| In the Matter of: | : | |
| L.J. | : | No. 19AP-231 |
| | | (C.P.C. No. 16JU-13255) |
| (R.N.A., | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant). | : | |

D E C I S I O N

Rendered on April 7, 2020

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, P.J.

{¶ 1} Defendant-appellant, R.N.A., mother of J.R., L.J., and M.A. (collectively "the children"), appeals from the judgments of the Franklin County Court of Common Pleas,

Division of Domestic Relations, Juvenile Branch, terminating her parental rights and placing the children in the permanent custody of plaintiff-appellee, Franklin County Children Services ("FCCS").  For the following reasons, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   This case involves FCCS's request for permanent custody of J.R., born in August 2002; L.J., born in August 2009; and M.A., born in July 2015.  Appellant is the biological mother of all three children.  The alleged fathers of J.R. and M.A. and the legal father of L.J. are not parties to this appeal.

{¶ 3}   Chronic school truancy issues involving L.J. prompted FCCS to become involved with the children and appellant in April 2016.  According to the complaint filed by FCCS for an order of temporary custody of L.J., appellant indicated to FCCS that L.J. missed school due to L.J.'s behavioral problems and because appellant had been in jail.  A truancy division program was unsuccessfully implemented: appellant failed to appear for any of the scheduled hearings and did not complete a mental health assessment or drug and alcohol assessment, which were requested due to appellant's history of untreated mental health and substance abuse issues.  L.J. also did not complete an assessment related to her behavioral issues.

{¶ 4}   L.J. was placed in temporary custody of FCCS on August 23, 2016.  After custody for L.J. expired by the operation of law, FCCS refiled a complaint on November 7, 2016 alleging L.J. to be a dependent child under R.C. 2151.04(C).  The complaint noted that appellant continued to be inconsistent with her contact with the FCCS service team, struggled with resource management, lacked phone service for several weeks, was inconsistent about visitation with the children, and missed more than three visits despite being provided bus passes.  According to the complaint, FCCS met with appellant and the children at the end of October and provided appellant with her case plan and referrals for a drug screen and mental health assessment, which appellant did not complete.  FCCS received a temporary order of custody for L.J. on November 8, 2016.  On January 31, 2017, L.J. was adjudicated dependent, and FCCS received court-ordered protective supervision on February 6, 2017 whereby L.J. returned to appellant's care.  On May 23, 2017, all three children were placed in the temporary custody of FCCS.

{¶ 5} On October 3, 2017, FCCS filed complaints for temporary custody of J.R. and M.A. Regarding J.R., the complaint alleged J.R. to be a neglected child under R.C. 2151.03(A)(2) and (3) and a dependent child under R.C. 2151.04(C) and (D)(1) and (2). The complaint stated that since the case opened due to L.J.'s truancy, appellant had voluntarily agreed to work with FCCS with her other children. According to the complaint, appellant had still not completed the mental health or drug and alcohol assessments and had completed one out of four random drug screens; she tested positive for benzodiazepines. Appellant reported having medical issues that prevent her from gainful employment but had not started the process to apply for social security benefits or sought other employment resources. Appellant was facing both an eviction case pending in Franklin County and an active warrant on a criminal charge in Delaware County. The complaint states that J.R. did complete an assessment but then did not follow through with the recommendations for community-based counseling services. J.R. also faced school-filed truancy charges arising out of his unexcused absences. FCCS expressed concern that J.R. is left to supervise and care for his younger siblings despite having been diagnosed with mental health disorders.

{¶ 6} The complaint for temporary custody of M.A. alleged M.A. to be a neglected child under R.C. 2151.03(A)(2) and a dependent child under R.C. 2151.04(C) and (D)(1) and (2). The allegations in the complaint are essentially the same allegations as stated in the complaint for temporary custody of J.R. On October 4, 2017, FCCS received temporary custody of J.R. and M.A. Both children were adjudicated to be dependent minors; temporary court commitment of J.R. was granted to FCCS on November 14, 2017, and temporary court commitment of M.A. was granted to FCCS on December 8, 2017.

{¶ 7} On March 21, 2018, FCCS filed motions for permanent custody, also called permanent court commitment ("PCC"), with respect to each child. The motions stated that for each child, FCCS would establish R.C. 2151.414(B)(1)(a) and (b) by clear and convincing evidence and that permanent custody is in the best interest of the children under R.C. 2151.414(D)(1). FCCS stated R.C. 2151.414(D)(2), which provides circumstances in which the court must grant permanent custody, did not apply in these cases.

{¶ 8} According to the motions for permanent custody, appellant failed to utilize medical, psychological, and other resources made available through the case plan, engage in the treatment recommendations following her mental health and drug and alcohol

assessments, or demonstrate sobriety through consistently clear drug screens as she completed just 1 of 75 random drug screens offered to her and tested positive for benzodiazepines. According to the motions, appellant is homeless, unemployed, unable to provide the basic needs of the children, and had an active warrant for her arrest due to a probation violation. The motions state appellant demonstrated a lack of commitment to the children by failing to make case plan progress or alleviating or mitigating the problems that initially resulted in the children's removal. The motions stated the children had been in the temporary custody of FCCS since May 23, 2017 and were in need of a legally secure permanent placement. Specific to J.R., FCCS stated J.R. was attending school on a consistent basis, participates in school activities, and expressed a desire to remain in his current foster home and not reunify with appellant. Regarding M.A., FCCS stated M.A. was demonstrating better social and verbal communication skills and was making progress on services she had been linked to.

{¶ 9} A hearing on the permanent custody motions was held on March 18, 2019. At the outset of the hearing, the trial court noted appellant had been served personally by a process server in all three cases. Appearances were made by the children's court-appointed guardian ad litem ("GAL"), a caseworker for FCCS, counsel for FCCS, counsel for appellant, and counsel for L.J. Appellant, the legal father of L.J., and the alleged fathers of J.R. and M.A. did not appear for the hearing. Appellant's counsel moved for a continuance to allow her to make contact with appellant in person since she had not been able to be in touch with appellant "in some time" due to appellant changing her address and the two phone numbers provided for appellant no longer being in service. (Mar. 18, 2019 Tr. at 5.) The motion for a continuance was opposed by the GAL, who cited the need to have permanency for the children, and was ultimately denied by the trial court.

{¶ 10} FCCS then called Charlotte Wolff, the caseworker assigned for all three children since June 2018. Wolff testified that she saw appellant in person the previous week at a visitation and specifically discussed the permanent custody court date. Appellant had a bus pass to attend the hearing.

{¶ 11} According to Wolff, FCCS originally became involved with the family for educational neglect in 2016 and initially worked on a voluntary basis with appellant. That arrangement was not successful as appellant missed court dates and scheduled home visits

and was not compliant with services obtained for the family. FCCS ultimately received temporary custody of all three children on May 23, 2017 and the children have continuously been in FCCS custody since that date. According to Wolff, the children were placed in separate foster homes, and L.J. and M.A. are "doing fine" with few behavioral concerns, while J.R. is also doing "okay" but had some behavioral concerns related to him recently fathering a child of his own. (Tr. at 12.) Wolff testified the children do not have special needs, but L.J. is in counseling, sees a psychiatrist, and takes related medication. According to Wolff, if the current foster homes of the children are not adoptive home options, FCCS would work to recruit a prospective adoptive home if the court granted permanent custody to FCCS.

{¶ 12} Wolff testified appellant had previously been inconsistent with visiting the children and, as a result, appellant was required to arrive one hour ahead of the scheduled visit time. Since August 2018, appellant had been "fairly consistent" in appearing for her weekly visitation with L.J. and M.A. at the agency. (Tr. at 31.) Wolff testified J.R. does not attend the visits because they do not have a good relationship, and he does not trust appellant. Wolff supervised at least one visitation per month, which took place in a room that is monitored, and described appellant's behavior during the visits as "very appropriate." (Tr. at 19.) Wolff testified L.J. and M.A. appear bonded with appellant and enjoy her visits.

{¶ 13} Wolff outlined appellant's case plan objectives as follows: complete and test negative on scheduled drug screens; complete alcohol and drug and mental health assessments and follow all recommendations, including counseling; complete a psychological evaluation and follow all recommendations; contact her primary care physician for all physical ailments; engage in family counseling; and make herself available for the caseworker service team. Wolff testified appellant completed the alcohol and drug assessment, and a letter dated April 2017 from the organization that conducted that assessment stated that no further services were recommended at that time in regard to substance abuse.

{¶ 14} Wolff testified appellant also completed the mental health assessment, but appellant's refusal to sign any releases of information, even after Wolff discussed the importance of the releases with appellant at every visit and tried to get other people to

convince her to sign the releases, resulted in Wolff being unable to verify that appellant participated in or completed the recommended services set by the assessment, including counseling. According to Wolff, appellant claimed she attends mental health counseling and gave Wolff a letter dated October 2018 purporting to confirm appellant was attending counseling. Wolff's attempts to confirm the accuracy of this letter failed. Wolff was also unable to verify whether appellant obtained a psychological assessment and, if so, whether that assessment resulted in any necessary treatment or services.

{¶ 15} Wolff testified, with appellant's history, it is normal to include random drug screens as a part of mental health treatment. According to Wolff, appellant completed one drug screening for her in July 2018 and tested negative. Wolff stated appellant claimed she completes drug screens and offered Wolff a "paper" that said "drug screen," but Wolff's attempts to confirm the accuracy of the paper failed. (Tr. at 18.)

{¶ 16} Regarding the objective of appellant contacting her primary care physician, Wolff testified appellant reports many physical disabilities, and there was a concern about her use of prescription drugs, so an objective was designed to ensure appellant was being medicated appropriately for her conditions. Wolff was not able to verify appellant met this case objective.

{¶ 17} According to Wolff, appellant was not employed, and she was unable to give Wolff a current address. Wolff testified appellant "hops around" from house to house, and appellant told Wolff she was not allowed to visit where she was staying. (Tr. at 15.) Appellant had never established consistent income or housing throughout the time Wolff served as caseworker. In Wolff's opinion, appellant had not done anything to remedy the issues that required the children to be removed from the home.

{¶ 18} Next, FCCS called Brian Furniss, the GAL for all three children since August 2016, to testify. According to Furniss, after initially being removed from appellant's home, L.J. was returned to appellant's care. However, during a hearing, L.J.'s ear was visibly leaking, and it was determined she had an untreated ear infection. J.R. also raised concerns of neglect and expressed to Furniss that he spent a lot of time caring for the younger children. All three children were removed from the home.

{¶ 19} Furniss testified he had limited contact with appellant because she was difficult to get a hold of, so their interaction had largely been at court. He once had

attempted to do a home visit with appellant, but she would not allow him into the home. Furniss also testified he attempted to observe appellant's visitations with the children, but appellant had not appeared at those scheduled visits.

{¶ 20} According to Furniss, J.R. and L.J. did not really have a relationship or, described another way, had a "strained" relationship due to J.R.'s poor relationship with appellant. (Tr. at 43.) Although J.R. and M.A. had previously been in the same foster home, Furniss believed J.R. was not close to M.A. due to their age separation and thought J.R. wanted to cease serving in a parenting role with M.A. Furniss noted L.J. and M.A. had not been placed together in foster care because L.J. was found being physically violent with M.A., and Furniss recommended against placing them in the same home together.

{¶ 21} As for the wishes of the children, Furniss testified J.R. did not want to return to appellant. While L.J. wanted to return to appellant, and Furniss acknowledged L.J. and appellant were bonded, Furniss recommended against L.J.'s wish due to appellant's lack of consistency and housing. Furniss agreed severing the bond between L.J. and appellant would affect L.J. in the short term but believed L.J. needed permanency, rather than being "dragged along with * * * what seems to be false hope." (Tr. at 46.) Furniss testified M.A. could not articulate her wishes due to her young age, lack of understanding of the concept of permanency, and special needs and development interventions. Furniss testified to appellant being less stable than she had been when the children were removed. Overall, appellant had no stability in terms of housing, had mental health concerns, and was not in a position to parent M.A. or L.J. Furniss recommended PCC for all three children.

{¶ 22} No additional witnesses were called by any party. Appellant's attorney offered one exhibit—the letter verifying the alcohol and drug assessment—which was admitted without objection.

{¶ 23} On March 27, 2019, the trial court issued a decision and judgment entry in favor of FCCS. The trial court first found by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1)(b), the children were abandoned by their respective alleged or legal fathers. As an alternative, the trial court found clear and convincing evidence showed that, pursuant to R.C. 2151.414(B)(1)(a) and (E), the children cannot be placed with their parents within a reasonable amount of time. In doing so, the trial court found evidence supported the existence of R.C. 2151.414(E)(1), (2), (4), (14), and (16).

{¶ 24} Having found R.C. 2151.414(B)(1)(a) and (b) applied, the trial court considered the factors listed in R.C. 2151.414(D) and whether granting permanent custody to FCCS was in the best interest of the children. Based on the testimony and evidence presented at the hearing and the entire case file for each child, the trial court found clear and convincing evidence demonstrated PCC is in the children's best interest. Therefore, the trial court granted FCCS's motion for PCC and terminated the parental rights of appellant, the alleged fathers of M.A. and J.R., and the legal father of L.J.

{¶ 25} Appellant filed a timely appeal.

## II. ASSIGNMENT OF ERROR

{¶ 26} Appellant assigns the following as trial court error:

> The juvenile court's judgment granting permanent court commitment of the minor children to Franklin County Children Services is against the manifest weight of the evidence.

## III. STANDARD OF REVIEW

{¶ 27} In reviewing a manifest weight challenge to a juvenile court's judgment granting PCC, an appellate court employs the following standard of review:

> A trial court's determination in a PCC case will not be reversed on appeal unless it is against the manifest weight of the evidence. In reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, an appellate court must make every reasonable presumption in favor of the judgment and the trial court's findings of facts. If the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the juvenile court's verdict and judgment. An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence.

(Internal citations and quotations omitted.) *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19.

## IV. LEGAL ANALYSIS

{¶ 28} Appellant argues the trial court's judgments granting FCCS permanent custody of the children is against the manifest weight of the evidence. We disagree.

{¶ 29} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-

Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  "The Supreme Court of Ohio has recognized the essential and basic rights of a parent to raise his or her child."  *In re H.D.* at ¶ 10, citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990).  "These rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child."  *In re H.D.* at ¶ 10, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).  "Thus, in certain circumstances, the state may terminate the parental rights of natural parents when it is in the best interest of the child."  *In re H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000).

{¶ 30}  "A decision to award permanent custody requires the trial court to take a two-step approach."  *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18.  A trial court must first determine if any of the factors set forth in R.C. 2151.414(B)(1) apply and then determine whether a grant of permanent custody to FCCS is in the best interest of the child.  *Id.*; *In re H.D.* at ¶ 16; R.C. 2151.414(B)(1).  In this case, appellant only challenges the second step, arguing the trial court's determination that PCC was in the children's best interest is against the manifest weight of the evidence.

{¶ 31}  With respect to determining the best interest of a child, the trial court must consider all relevant factors including, but not limited to, the following:

> (a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).  The factors listed in R.C. 2151.414(E)(7) through (11) are:

(7)  The parent has been convicted of or pleaded guilty to one of [several listed offenses];

(8)  The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9)  The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10)  The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

"The burden of proof falls upon FCCS to prove by clear and convincing evidence that an award of permanent custody is in the child's best interest."  *In re K.L.* at ¶ 20; R.C. 2151.414(B)(1).  "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established."  *In re N.L.*, 10th Dist. No. 19AP-397, 2020-Ohio-166, ¶ 19, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  "It is more than a mere preponderance of the

evidence but does not require proof beyond a reasonable doubt." *In re N.L.* at ¶ 19, citing *Cross* at paragraph three of the syllabus.

{¶ 32} Here, though the juvenile court did not specify which of the factors set forth in R.C. 2151.414(D)(1)(a) through (e) favored PCC, the juvenile court's decision and the evidence in the record support the trial court's decision in favor of PCC. *See In re M.D.*, 10th Dist. No. 18AP-786, 2019-Ohio-3674, ¶ 54 (affirming trial court determination of PCC despite trial court not specifying how R.C. 2151.414(D)(1) factors were weighed). Because only appellant appealed the trial court's judgments, we will focus our review of the record and trial court findings to those relevant to appellant.

### A. R.C. 2151.414(D)(1)(a)

{¶ 33} Subsection (a) requires the juvenile court to consider the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child. The trial court found that appellant, L.J., and M.A. share a bond, that L.J. wants to reunify with appellant, and that appellant's visits with the younger children generally go well. Regarding J.R., the trial court found appellant and J.R. do not have a good relationship, and J.R. does not wish to be reunified with appellant. Furthermore, the trial court found the GAL's testimony established that J.R. and L.J. have a very strained relationship, J.R. and M.A. are bonded but are not close due to their age separation, and L.J. and M.A. are not placed together because L.J. tried to physically harm M.A. The trial court noted J.R. is ready to move on with his life and no longer wants to parent M.A., which is at least part of the reason he previously missed so much school while in appellant's care.

### B. R.C. 2151.414(D)(1)(b)

{¶ 34} Subsection (b) requires the juvenile court to consider the wishes of the child, as expressed directly by the child or through the child's GAL, with due regard for the maturity of the child. The trial court determined that the GAL testified that M.A. cannot express her wishes due to her age, but J.R. and L.J. can clearly articulate their wishes and are split on their views: L.J. would like to be reunited with appellant, while J.R. does not. The trial court found the GAL, who had been appointed to the case since "the very beginning," recommended PCC be granted despite L.J.'s wishes. The trial court noted the GAL's testimony that reunification of L.J. with appellant had previously failed, that

appellant was even less stable than she had been on March 23, 2017, and that the children needed a legally secure placement.  (Mar. 27, 2019 Decision at 7.)

### C.  R.C. 2151.414(D)(1)(c)

{¶ 35}  Subsection (c) requires the juvenile court to consider the custodial history of the child.  The trial court found all three children had been in the uninterrupted custody and care of FCCS since May 23, 2017.  The trial court noted FCCS filed its motion for permanent custody prior to the children being in FCCS's custody for 12 or more consecutive months in a 22-month period and, therefore, did not seek custody on that basis under R.C. 2151.414(B)(1)(d).  However, the trial court noted the length of time the children have been under FCCS's care remains a relevant best-interest factor.

### D.  R.C. 2151.414(D)(1)(d)

{¶ 36}  Subsection (d) requires the juvenile court to consider the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.  The trial court found appellant "has failed to substantially remedy the causes for the children's removal by failing to complete the case plan," which, as it had noted earlier in the decision, occurred despite FCCS's reasonable and diligent case planning and efforts to prevent the removal of the children from her home.  (Decision at 8.)  The trial court observed that appellant did not appear for the hearing.  The trial court found no relatives are available for placement and/or custody of the children but remarked that a cousin who came forward for the first time one week prior to the hearing, but who did not file a motion, could apply to adopt the children if truly interested.  Finally, the trial court found the children are in need of a legally secure placement, which cannot be achieved without a grant of permanent custody to FCCS.

### E.  R.C. 2151.414(D)(1)(e)

{¶ 37}  Subsection (e) asks whether any of the factors in divisions (E)(7) through (11) apply.  The trial court found R.C. 2151.414(E)(10), which asks whether the child is abandoned, to be applicable to all three fathers.  This factor is inapplicable to appellant on this record.

**F.  PCC Is In The Best Interest Of J.R., L.J., and M.A.**

{¶ 38} While appellant does not cite to specific parts of the Revised Code, appellant appears to challenge R.C. 2151.414(D)(1)(a), (b), and (d).  Pertinent to R.C. 2151.414(D)(1)(a), appellant argues the evidence clearly showed both L.J. and M.A. were bonded with appellant, appellant visited L.J. and M.A. on a consistent, weekly basis, and appellant behaved appropriately with the children on those visits.  Relevant to R.C. 2151.414(D)(1)(b), appellant notes the evidence showed L.J. wanted to return to appellant's care.  Appellant further argues, presumably in reference to R.C. 2151.414(D)(1)(d), that no evidence showed that FCCS could ever provide permanency for any of the children but, instead, the evidence showed the children had been placed in separate foster homes, had been in more than one foster home while in FCCS custody, and none of the homes were prospective adoptive placements.  According to appellant, the evidence supports the conclusion that L.J. "will likely remain in foster care, without real permanency, until she is emancipated," and this scenario "cannot be in her best interest."  (Appellant's Brief at 11.)

{¶ 39}  FCCS agrees that the evidence shows L.J. and M.A. are bonded to appellant and that appellant interacted appropriately at the visits she attended.  However, FCCS adds the evidence also showed: J.R. is not bonded to appellant and expressed his desire to not be placed with appellant; the GAL recommended the trial court grant FCCS's motion for all the children due to appellant's lack of consistency and housing; the custodial history factor under R.C. 2151.414(D)(1)(c) weighs in favor of permanent custody; and the evidence established appellant is not a secure placement for the children under R.C. 2151.414(D)(1)(d) considering appellant had no verified housing and employment and did not substantially comply with the case plan.  According to FCCS, these additional factors show placement with appellant is not safe or adequate for the children's needs, which outweighs the bond M.A. and L.J. have with appellant.  FCCS notes, while the likelihood of adoption may be considered in determining the best interest of the child, the permanent custody statute does not require FCCS to prove a permanent home or adoption is likely.

{¶ 40}  Having reviewed the record of this case, we agree with FCCS.  It is undisputed L.J. wishes to return to appellant, there is a bond between appellant and the two younger children, and appellant behaved appropriately with the two younger children during supervised visitation at FCCS, which she attended "fairly consistent[ly]."  (Tr. at 31.)

However, competent, credible evidence, particularly appellant's failure to complete her case plan and inability to secure and retain demonstrably safe housing for the children, supports the trial court's decision that PCC is in the best interest of the children. *In re M.L.J.*, 10th Dist. No. 04AP-152, 2004-Ohio-4358, ¶ 8 (holding non-compliance with the case plan is a ground for termination of parental rights); *In re M.D.*, 2019-Ohio-3674, at ¶ 55 (citing some progress on case plan without completion of the case plan as basis to support trial court's conclusion that PCC is in the best interest of a child). *See also In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 25 ("Although mother has had relatively stable employment, steadily worked toward her case-plan objectives, maintained a bond with the children, and made efforts to stay updated on the children's special needs, these positive actions are unfortunately in vain given her inability to provide a safe and stable home for the children.").

{¶ 41} First, though appellant made some progress on the case plan, including completing a drug and alcohol and mental health assessment, appellant did not complete the case plan. Specifically, the record shows appellant has a history of mental health concerns, but the caseworker was not able to confirm that appellant followed up with recommendations issued from the mental health assessment or that appellant completed a psychological assessment and followed through with any related recommendations or treatment. Appellant also only completed one drug screen during the caseworker's tenure and did not complete the case plan objective of meeting with her primary care physician, which related to concerns about appellant's use of prescription drugs. Appellant's refusal to permit the release of information greatly complicated the caseworker's ability to confirm appellant's completion of the case plan.

{¶ 42} Second, the record shows appellant has, both historically and at the time of the hearing, failed to secure stable housing and hindered inspection of places she lived. The caseworker and GAL testified appellant consistently lacked secure housing, did not permit them to observe places where she lived, and generally was difficult to locate and contact. When the children did live with appellant, the record evidenced ongoing neglect. The GAL testified in the period that L.J. was returned to appellant's care, she suffered from an observable medical condition that was left untreated; J.R. also spoke about having to assume an unwanted parenting role of M.A.

{¶ 43} Furthermore, the children have been in the custody of FCCS since May 23, 2017 and were generally doing "fine" in foster care. (Tr. at 12.) Although evidence was not presented by FCCS that the children's respective foster homes were potential adoptive placements, the lack of a likely adoption does not preclude a trial court from finding that an award of permanent custody is in the children's best interest. *In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 51 (finding that, while the likelihood that a child will be adopted may be considered in determining the child's best interest, "the statutes governing permanent custody simply do not require an agency to prove that adoption is likely"). The caseworker also testified if FCCS obtained permanent custody, it would work to secure such an adoption for each child, and the trial court noted that a cousin of the children, who appeared shortly prior to the hearing to express an interest in custody of the children, could apply to adopt the children if she was interested in doing so once FCCS had permanent custody.

{¶ 44} Finally, on this record, to find against PCC, the juvenile court would have had to disregard the unequivocal recommendation in favor of PCC made by the GAL, a person who had worked with the family since August 2016. It is significant that the GAL considered appellant less stable than she had been when the children were removed from her care in 2017.

{¶ 45} Considering all the above, we find the trial court judgments are supported by competent, credible evidence and, therefore, the judgments are not against the manifest weight of the evidence. *In re E.B.*, 2017-Ohio-2672, at ¶ 19. Consequently, appellant's assignment of error lacks merit.

{¶ 46} Accordingly, appellant's sole assignment of error is overruled.

## V. CONCLUSION

{¶ 47} Having overruled appellant's sole assignment of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

KLATT and BRUNNER, JJ., concur.

_____